UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| TIMOTHY TRASK, | ) |
|     Plaintiff | ) ) ) |
| v. | ) 1:12-cv-00050-DBH ) |
| SWISH KENCO, LTD., | ) ) |
|     Defendant | ) |

## RECOMMENDED DECISION

Defendant Swish Kenco, Ltd. ("Swish Kenco") has filed a motion for summary judgment against plaintiff Timothy Trask, arguing that there is no genuine issue of material fact concerning Trask's discrimination claims, which Trask asserts pursuant to the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., and the Maine Human Rights Act (MHRA), 5 M.R.S. § 4571 et seq., and consequently Swish Kenco is not liable as a matter of law.  Swish Kenco also argues that in the event the Court does not decide in its favor on the issue of liability, it is nevertheless entitled to a partial summary judgment limiting the amount of any damage award to $50,000, pursuant to a statutory cap.  I recommend that the Court deny the motion as regards the issue of liability, on the basis that there is a genuine issue of material fact for trial concerning whether Swish Kenco discriminated against Trask.  However, I recommend that the Court grant the motion to the extent it requests a partial summary judgment on damages.

### I.   Facts

The following is the summary judgment record from which the recitation of facts below is drawn: Defendant's Statement of Material Facts ("Stmt.," ECF No. 21), Plaintiff's Opposing Statement of Material Facts ("Opp. Stmt." or "Add'l Stmt.," ECF No. 23), Defendant's Reply Statement of Material Facts ("Reply Stmt.," ECF No. 29), and Plaintiff's Response to

1

Defendant's Reply Statement of Material Facts ("Response Stmt.," ECF No. 30).  Direct review of the evidentiary sources submitted in support of the parties' statements of fact has been limited to statements involving denials and qualifications.  The facts recited below are undisputed except where otherwise indicated.  Where the parties dispute the facts, I have reviewed the record in the light most favorable to Trask as the nonmoving party.  See Cadle Co. v. Hayes, 116 F.3d 957, 959 (1st Cir. 1997).

### A.  Basic background about the company and number of employees

Swish Kenco is in the business of distributing cleaning products and equipment for industry.  (Opp. Stmt. ¶ 1.)[1]  It also provides support services for some of the products and equipment that it distributes.  (Opp. Stmt. ¶ 1.)  Swish Kenco has four branches, one of which was in Holden, Maine, and later moved to Bangor, Maine; two of which are in Vermont; and one of which is in New York.  (Opp. Stmt. ¶ 1.)  During the relevant time, Swish Kenco's Maine branch had two departments: sales and operations.  (Opp. Stmt. ¶ 3.)  Michael Martin, who made the decision to terminate Trask's employment, is the general manager of the Maine branch, and Donna Shorette, who was Trask's supervisor, oversees day-to-day management of the operations department in Holden.  (Opp. Stmt. ¶¶ 2, 11, 34.)

There are numerous disputed facts concerning Swish Kenco's management relationship with a Canadian company called Swish Maintenance Limited.  (Response Stmt. ¶¶ 46-47, 53-56.)  Trask asserts that there is a genuine issue of material fact centering on whether Swish Kenco and Swish Maintenance Limited were integrated enterprises such that their employee numbers could be aggregated for purposes of assessing the applicable cap on damages.  (Def.'s Opp'n at 13-17.)  However, whatever management structure the two companies have, that

---

[1] To reduce the number of record citations, I cite to just one party's statement where it consolidates both parties' factual assertions.

structure does not alter the following essential and undisputed facts: Swish Kenco averaged from fifty to sixty employees in 2009 and 2010, and all of Swish Kenco's employees were in the United States. (Opp. Stmt. ¶¶ 40-41.) Swish Maintenance Limited is a Canadian corporation and a distinct company from Swish Kenco. (Response Stmt. ¶ 46.) Swish Maintenance Limited has no employees in the United States; rather, its employees all reside and work in Canada, and, with one exception, are all citizens of Canada. (Response Stmt. ¶ 46.)

### B. Trask's employment and computer use

Trask was hired in July 2007 as a service technician working from Swish Kenco's Holden office. (Opp. Stmt. ¶4.) Trask was mainly responsible for repairing equipment. (Opp. Stmt. ¶ 5.) Trask was skilled at repairs; Michael Martin, the general manager of Swish Kenco's Maine branch, testified that Trask was "an excellent mechanic." (Opp. Stmt. ¶33; Martin Dep, ECF No. 24-4, at 10.) John Crowell was the other employee who worked in service; he was hired in the summer of 2009, about two years after Trask was hired. (Opp. Stmt. ¶¶ 4, 29-30.)

Trask underwent two performance reviews, one in October 2007 and the other in November 2009. (Opp. Stmt. ¶¶ 9, 11.) The 2007 review included "paperwork" rather than computer use, and in that review Trask self-reported that he least liked his paperwork obligations. (Opp. Stmt. ¶ 9.) He also stated then that as of October 2007, he was dissatisfied that he was not faster at getting his paperwork done. (Opp. Stmt. ¶ 10.) Trask's performance was rated "medium" and his potential "high" in his 2007 review. (Add'l Stmt. ¶ 59; Reply Stmt. ¶ 59.)

By the time of Trask's second performance review, which occurred in November 2009, his computer skills were being evaluated along with other skills. (Opp. Stmt. ¶¶ 11, 12.) In that review, his performance and his potential both were rated "high." (Add'l Stmt. ¶ 67; Reply Stmt.

¶ 67.) Swish Kenco does not deny Trask's statement that Martin told him on at least a dozen separate occasions to "concentrate on billable service work and not to worry about paperwork," and Martin told Trask that Crowell "would take care of the paperwork." (Add'l Stmt. ¶¶ 75-76; Reply Stmt. ¶¶ 75-76.) Swish Kenco does not deny that Martin's fundamental message to Trask was to focus on billable hours rather than administration, and it does not deny that this focus remained the same after the company transitioned from a paper-based system to a computer-based system. (Add'l Stmt. ¶¶ 75-76; Reply Stmt. ¶¶ 75-76.)

  Swish Kenco uses a computer program called Winsol to view inventory, open and close work orders, and do invoicing and estimates. (Opp. Stmt. ¶ 6.) It is undisputed that Trask received training on Winsol. (Opp. Stmt. ¶ 7.) However, the parties dispute several facts concerning the computer-related job requirements and Trask's use of the computer to do his job. (Opp. Stmt. ¶ 6.) Trask admits that in his November 2009 performance review he stated that he needed to become more proficient with the computer system. (Opp. Stmt. ¶ 12.) However, Trask qualifies his admission with several facts explaining his less-than-stellar self-evaluation of his computer skills and why he was not doing more on the computer. (Opp. Stmt. ¶¶ 12-18.) First, he realized he would need to do more in order to make up for the poor performance of Crowell. (Opp. Stmt. ¶ 12.) Trask asserts that Crowell was not timely in getting his computer work done. (Opp. Stmt. ¶ 32.) Second, it was the responsibility of other employees to open work orders on the computer. (Opp. Stmt. ¶¶ 6, 13.) Third, Trask could not do estimates on the computer because Crowell had the template for estimates on his computer and would not share the template with Trask. (Opp. Stmt. ¶ 14; Add'l Stmt. ¶ 74; Reply Stmt. ¶ 74.) Trask acknowledged in his review that he occasionally made errors in transcribing numbers, but he asserts that these errors were occasional and he was just being hard on himself in the evaluation

because he has high standards. (Opp. Stmt. ¶¶ 17-18.) By June 2010, Trask was opening and closing files on the computer. (Opp. Stmt. ¶¶ 15, 21.) Trask used the computer to access product schematics over the Internet. (Add'l Stmt. ¶ 70; Reply Stmt. ¶ 70.)

As Trask asserts, Crowell's 2009 performance evaluation does indicate that Crowell's work was disorganized notwithstanding a reported strength in computer skills. (Add'l Stmt. ¶¶ 73, 77-82; Reply Stmt. ¶ 73, 77-82.) Trask's assertions about Crowell are consistent with Crowell's 2009 performance evaluation. (Opp Stmt. ¶¶ 12-14; Add'l Stmt. ¶¶ 73, 77-82; Reply Stmt. ¶¶ 73, 77-82.) It is undisputed that in April 2012, Crowell resigned in lieu of being terminated for poor performance. (Response Stmt. ¶ 83.)

### C.     The timing of Trask's medical information and medical leave

Either during his November 2009 review or at some other point in late 2009, Trask brought up with Swish Kenco the topic of his need for hip replacement surgery. (Add'l Stmt. ¶ 60; Reply Stmt. ¶ 60.) The timing of that surgery was not set at that point and was to some extent flexible, depending on the condition of Trask's hip over time and also on the business timing needs of Swish Kenco. (Add'l Stmt. ¶¶ 61-63; Reply Stmt. ¶¶ 61-63.) Trask told Martin that the doctor told Trask he should anticipate needing up to twelve weeks to recover from the hip surgery. (Add'l Stmt. ¶ 62; Reply Stmt. ¶ 62.) At some point, Trask was also diagnosed with a cancerous kidney tumor. (Opp. Stmt. ¶ 20.) He went on leave in March 2010 to be hospitalized for cancer treatment. (Opp. Stmt. ¶ 20.) He returned to work on June 14, 2010. (Opp. Stmt. ¶ 21.) When he returned, he was cleared to work without any restrictions based on the cancer. (Opp. Stmt. ¶ 21.)

### D.    The termination of Trask's employment

In the spring of 2010, Martin's boss told him that he must terminate the employment of two employees from the Holden office in order to reduce the company's payroll. (Opp. Stmt. ¶¶ 1, 22.) The costs in the operations department were too high in comparison with revenue, especially in service work, and there was not enough billable work in service to support two employees. (Opp. Stmt. ¶¶ 23, 29.) The two employees whose employment was terminated were Trask from the operations department and an employee from the sales department. (Opp. Stmt. ¶¶ 24, 35.) Trask's employment at Swish Kenco was terminated on June 30, 2010, which was two weeks after he returned to work following his medical leave for the cancer treatment. (Opp. Stmt. ¶¶ 21, 35.) Swish Kenco's termination letter to Trask states that the reason was "due to lack of service work and economic forces beyond our control." (Add'l Stmt. ¶ 85; Reply Stmt. ¶ 85.) No performance-based reason was mentioned in Trask's termination letter. (Add'l Stmt. ¶ 85; Reply Stmt. ¶ 85; Trask Decl., ¶ 14 & Exh. B, ECF No. 24-2.)

In late July 2010—a few weeks after Trask's termination—Martin signed a document on Swish Kenco letterhead entitled "Notes on the decision to lay off Tim Trask," which was the company's response to Trask's complaint with the Maine Human Rights Commission. (Add'l Stmt. ¶¶ 87-89; Reply Stmt. ¶¶ 87-89; Def.'s Response to Pl.'s Req. for Prod. of Docs., Attach. 1, ECF. No. 25-1.) That document states among other things:

> Despite all efforts over the past years, Tim Trask was the least multi-task proficient member of the operations team. He lacked sufficient proficiency in software to be fully independent in regards to invoicing and ordering parts, making it necessary to always tie up two individuals to complete a service order cycle. While he was a fully capable and proficient technician, which [sic] was the extent of the skill sets he could bring to the company.
>
> . . .

> We had two men in Service, and have had experience now running our service department with just one person now twice: once with just Tim Trask and once without him.  These two experiences left us all convinced that we would experience fewer traumas letting Tim go, than to let John Crowell go.

(Add'l Stmt. ¶¶ 87-89; Reply Stmt. ¶¶ 87-89; Def.'s Response to Pl.'s Req. for Prod. of Docs., Attach. 1, ECF No. 25-1.)  In Martin's deposition, he testified that he did not remember what he meant by "fewer traumas."  (Add'l Stmt. ¶¶ 89-90; Reply Stmt. ¶¶ 89-90; Martin Dep. at 12.)  Martin testified that he made the decision to terminate Trask rather than Crowell without first obtaining input from Shorette.  (Opp. Stmt. ¶ 34; Martin Dep. at 9.)  Martin did not recall exactly what he did to evaluate Trask and Crowell before he decided to terminate Trask.  (Opp. Stmt. ¶ 34; Martin Dep. at 10.)  Martin testified that he did not have day-to-day dealings with the service department at the Holden office.  (Opp. Stmt. ¶ 34; Martin Dep. at 10.)  Crowell was kept on doing service work.  (Opp. Stmt. ¶ 36; Martin Decl. at 2, ECF No. 21-2.)[2]  The parties dispute whether Swish Kenco created a new position for Crowell that combined the tasks of technician and coordinator.  (Opp. Stmt. ¶¶ 5, 27, 28, 36.)

## II.  Discussion

### A.  Summary judgment standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  By local rule, summary judgment facts are introduced by means of "a separate, short, and concise statement of material facts," supported by record citations.  D. Me. Loc. R. 56(b), (c).  The Court's review of the record is guided by the moving party's statement, the nonmoving party's opposing statement, including any additional statement, the moving

---

[2]    Swish Kenco appears to be correct in assuming that in Trask's response to paragraph 36, in which he both admits and objects, Trask mistakenly referred to his objection to paragraph 28 when he meant to refer to his objection to paragraph 27.  (Reply Stmt. ¶ 36.)

7

party's limited reply statement, and responses to objections. D. Me. Loc. R. 56(b)-(e); see also Toomey v. Unum Life Ins. Co. of Am., 324 F.Supp.2d 220, 221 n. 1 (D. Me. 2004) (explaining "the spirit and purpose" of Local Rule 56). Appropriate record sources include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

Because many factual disputes depend on circumstantial evidence, to determine whether a fact is established circumstantially, the Court will draw all reasonable inferences in favor of the nonmoving party where those inferences are supported by the nonmoving party's cited record sources. See Cadle, 116 F.3d at 959-60. However, where the nonmoving party bears the burden of proof, he still must present "definite, competent evidence" from which a reasonable person could find in his favor. Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir.1991). If the Court's review of the record reveals evidence sufficient to support a judgment in favor of the nonmoving party on one or more of his claims, then there is a trial-worthy controversy and summary judgment must be denied to the extent there are supported claims. Unsupported claims are properly dismissed. Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses.").

**B. Disability discrimination law and Trask's prima facie evidence**

Trask's claims under the ADA, 42 U.S.C. § 12101 et seq., and the MHRA, 5 M.R.S. § 4571 et seq., are evaluated in the same manner. See Forrest v. Brinker Int'l Payroll Co., LP, 511 F.3d 225, 228 n.1 (1st Cir. 2007) ("Maine courts apply the MHRA in accordance with federal anti-discrimination law."). The ADA "prohibits an employer from discriminating against a

8

qualified person with a disability" by discharging him or her because of a disability or a perceived disability. Ramos-Echevarría v. Pichis, Inc., 659 F.3d 182, 186 (1st Cir. 2011). Both parties agree that there is no direct evidence of discrimination by Swish Kenco against Trask. (Motion at 5, ECF No. 20; Opposition at 7, ECF No. 22.) Therefore, Trask must make his case, if at all, through the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

> The McDonnell Douglas analysis requires the plaintiff to offer evidence sufficient to establish that he '(i) has a disability within the meaning of the ADA; (ii) is qualified to perform the essential functions of the job, with or without reasonable accommodations; (iii) was subject to an adverse employment action by a company subject to the ADA; (iv) was replaced by a non-disabled person or was treated less favorably than non-disabled employees; and (v) suffered damages as a result.'

Ramos-Echevarría, 659 F.3d at 186 (alterations omitted) (quoting Jacques v. Clean-Up Group, Inc., 96 F.3d 506, 511 (1st Cir. 1996)). "If [the plaintiff] establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its action. If the employer offers a non-discriminatory reason, the burden then shifts back to the plaintiff to show that the employer's justification is mere pretext cloaking discriminatory animus." Id. at 186-87 (citations omitted).

Swish Kenco concedes, for purposes of this motion, that Trask has made a prima facie case under the McDonnell Douglas analysis. (Motion at 6-7.) Trask in turn concedes that Swish Kenco has articulated a legitimate, nondiscriminatory reason for terminating one of its two service technicians. (Opposition at 7.) Both parties therefore focus on the next step of the analysis, which is whether there is a genuine issue of material fact concerning whether Swish Kenco's justification for terminating Trask was "mere pretext cloaking discriminatory animus." Ramos-Echevarría, 659 F.3d at 186-87.

9

The issue here is not whether Swish Kenco had a legitimate reason for terminating the employment of one of its service technicians. Both parties agree that the company had a business-based need to pare down its work force. Rather, the issue is whether Trask has met his burden to present prima facie evidence that Swish Kenco, when deciding between Trask and Crowell for dismissal, selected Trask discriminatorily based on his disability, rather than based on its articulated justification that Trask lacked versatility.

The First Circuit has noted, in a claim of age-related employment discrimination, that "the pretext inquiry is heavily fact-specific." Sabinson v. Trustees of Dartmouth Coll., 542 F.3d 1, 5 (1st Cir. 2008). A jury's disbelief of the employer's justification may suffice to permit the trier of fact to find pretext and, depending on the facts of the case, discrimination. See Zapata-Matos v. Reckitt & Colman, Inc., 277 F.3d 40, 45 (1st Cir. 2002). Pretext can also be established by showing that the employer's justifications were arrived at after the termination or other adverse action. Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 56 (1st Cir. 2000). In Santiago-Ramos, a memorandum prepared several weeks after the employee's termination and after legal action had commenced giving after-the-fact reasons for the termination could be considered evidence of pretext. Id. "[W]eaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" could be evidence of pretext. Id. (quotation marks omitted). However, "even if the trier of fact disbelieves the nondiscriminatory explanation given by the employer, the trier is not compelled to find that the real reason was discrimination. That is because the ultimate question is not whether the explanation was false, but whether discrimination was the cause of the termination." Zapata-Matos, 277 F.3d at 45 (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000); Thomas v. Eastman Kodak Co., 183 F.3d 38, 57-58 (1st Cir. 1999)).

Swish Kenco makes four main arguments in support of its motion for summary judgment. First, Swish Kenco dismisses the notion that a jury could infer discriminatory animus from the short time span between Trask's medical leave and his termination. (Motion at 7-8.) It argues that retaliation cases such as <u>Collazo v. Bristol-Meyers Squibb Mfg., Inc.</u>, 617 F.3d 39 (1st Cir. 2010), in which the First Circuit held that temporal proximity was sufficient to establish a prima facie case of causation, are distinguishable because the claim in <u>Collazo</u> was based on retaliation, whereas here it is based on discrimination. (Motion at 7-8.) However, the First Circuit has held in a disability discrimination case that "[t]he timing of [the plaintiff employee's] firing, one month after his heart attack, was circumstantial evidence from which the jury could find that [the employee's] disability triggered, in whole or in part, his firing by [the defendant employer]." <u>Katz v. City Metal Co., Inc.</u>, 87 F.3d 26, 33 (1st Cir. 1996). In <u>Palmquist v. Shinseki</u>, 689 F.3d 66, 75 (1st Cir. 2012), the First Circuit questioned part of its ruling in <u>Katz</u>, but the Court left intact the portion relevant here, which is that temporal proximity may be circumstantial evidence of disability discrimination.

Second, Swish Kenco argues that the fact that Trask was cleared to work without medical restrictions after his cancer treatment dissipates any inference that his termination could have been discriminatory. (Motion at 8.) However, Trask had just returned from a long leave for cancer treatment and still had looming the prospect of hip surgery and a twelve-week recovery, not to mention that the cancer itself may cause him to be perceived as having a continuing disability. <u>See</u> 42 U.S.C. § 12102(1)(C) ("The term 'disability' means, with respect to an individual—being regarded as having . . . an impairment."). Depending on whose version of events a jury may credit, it could conclude that Trask was fired because he was not versatile enough, or, alternatively, that he was fired due to the perception that his usefulness had been

compromised by his disability. Trask has met his burden of generating sufficient evidence to allow the jury to make the determination.

Third, Swish Kenco argues that if it had wanted to terminate Trask's employment due to the impending hip surgery, it would have marked his evaluation down in November 2009 and then terminated him at that point. (Motion at 9.) This is nothing more than an assertion that if Swish Kenco had intended to discriminate against Trask, it would have done so in a more calculated and underhanded manner. This argument does not address the facts as presented in the current summary judgment record and whether those facts are sufficient to create a genuine issue of material fact to be tried.

Fourth, Swish Kenco argues that its justification that Trask lacked versatility on the computer is genuine because it was established at his November 2009 performance evaluation, which was months in advance of his termination. (Motion at 9.) This is essentially an argument that because Swish Kenco's articulated justification is based on facts that do not suggest temporal proximity to Trask's termination, there is insufficient evidence to generate a genuine issue of material fact regarding pretext.

This argument disregards that there is other evidence from which a jury could reasonably find discrimination. The summary judgment record includes several facts that would support such a finding. First, Swish Kenco in its letter to Trask said that the reason for his termination was "economic forces beyond [Swish Kenco's] control," with no mention of the quality of Trask's work. Then, a few weeks after Trask's termination, the company introduced his performance and the decision to opt for the likelihood of "fewer traumas" to the company as its justification for his termination, in its response to Trask's Maine Human Rights Commission complaint. A jury could reasonably find that Swish Kenco had introduced the performance issue

after the fact.  Second, Swish Kenco rated Trask's performance and potential both as "high" in his November 2009 evaluation, notwithstanding that Trask's self-assessment was modest and frank about his weaknesses, and Martin told Trask repeatedly to focus on obtaining billable hours in his role as service technician.  A jury could reasonably discount Swish Kenco's articulated performance-based justification based on its admissions that Trask was an excellent mechanic and that it wanted him to focus on doing billable hours rather than paperwork.  Third, a jury could reasonably discount the justification on the basis that Martin alone made the decision to terminate Trask rather than Crowell on grounds of Trask's comparative lack of versatility, but Martin admitted that he did not remember comparatively evaluating the versatility of Crowell and Trask or their actual work performed on the computer.  Fourth, a jury could reasonably discount the justification based on evidence of Crowell's performance review and Trask's testimony―which is consistent in some ways with Crowell's review―about Trask's own work experience with Crowell.

At this stage of the litigation, the record must be viewed "in the light most flattering to the nonmovant" and the court draws "all reasonable inferences" in favor of Trask as the nonmoving party.  See Cadle, 116 F.3d at 959 (quotation marks omitted).  Trask has met his burden of producing sufficient prima facie evidence to generate a genuine issue of material fact concerning discrimination.

**C.  Damages**

In the event the Court does not grant Swish Kenco a full summary judgment, it seeks a partial summary judgment limiting any award of compensatory or punitive damages to a cap of $50,000, pursuant to 42 U.S.C. § 1981a(b)(3)(A).  Section 1981a(b)(3) limits "compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering,

13

inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, and the amount of punitive damages," and subsection 1981a(b)(3)(A) provides that the statutory limit is $50,000 "in the case of a respondent who has more than 14 and fewer than 101 employees in each of 20 or more calendar weeks in the current or preceding calendar year." The cap is the same under the Maine statute for the same number of employees. See 5 M.R.S. § 4613(2)(B)(8)(e)(i).

Trask concedes, for purposes of the summary judgment motion, that Swish Kenco averaged from fifty to sixty employees in 2009 and 2010, and that all of Swish Kenco's employees were in the United States. He argues, however, that a genuine issue of material fact exists concerning whether the employees of Swish Kenco and Swish Maintenance Limited should be aggregated to arrive at the total employee count for purposes of determining which damages cap applies. (Opposition at 13-17.) Trask argues that the two entities should be considered an "integrated enterprise" for purposes of the statutory cap. (Opposition at 14-17.) Swish Kenco argues that the employees of Swish Maintenance Limited cannot be counted toward the damages cap because Swish Maintenance Limited is a foreign entity; its employees are all residents of and work in Canada; and, with one exception, all of those employees are Canadian citizens. (Reply at 5-7.)

The issue whether the Swish Maintenance Limited employees can be counted in determining which damages cap applies is governed by 42 U.S.C. §§ 12111(4), 12112(c), which address employee citizenship and foreign entities, respectively. Section 12111(4) states that the term "employee," "[w]ith respect to employment in a foreign country, . . . includes an individual who is a citizen of the United States." Subsection 12112(c)(2)(B) states that section 12112,

14

which makes disability discrimination illegal, "shall not apply with respect to the foreign operations of an employer that is a foreign person not controlled by an American employer."

In interpreting the ADA, courts frequently turn to cases interpreting Title VII of the Civil Rights Act of 1964, which prohibits discrimination in employment based on race, color, religion, sex, or national origin, 42 U.S.C. § 2000e et seq., because "[c]laims of employment discrimination arising under the ADA are subject to the same remedies and procedures as those under Title VII." Farris v. Shinseki, 660 F.3d 557, 562 (1st Cir. 2011) (citing 42 U.S.C. § 12117(a)). In Shekoyan v. Sibley Int'l, 409 F.3d 414 (D.C. Cir. 2005), the court held that "Title VII does more than merely exclude an alien employed overseas from protection; it affirmatively grants protection only to 'a citizen of the United States.'" Id. at 422 (quoting 42 U.S.C. § 2000e(f), which provides―identically to section 12111(4) of the ADA―that "[w]ith respect to employment in a foreign country, [the term 'employee'] includes an individual who is a citizen of the United States").

In Mousa v. Lauda Air Luftfahrt, A.G., 258 F. Supp. 2d 1329 (S.D. Fla. 2003), which involved a Title VII claim for religious discrimination, the court noted that "the majority of courts that have addressed the issue have found that foreign citizens employed abroad who work exclusively outside of the United States do not count towards that fifteen-employee jurisdictional minimum." Id. at 1335-36 (collecting cases). Similarly, in Russell v. Midwest-Werner & Pfleiderer, Inc., 955 F. Supp. 114 (D. Kan. 1997), which involved a Title VII claim for sexual harassment, the court held that "[f]oreign employees of a foreign corporation are not considered employees for purposes of counting the total number of the defendant's employees." Id. at 115 (quotation marks omitted); Russell v. Midwest-Werner & Pfleiderer, Inc., 949 F. Supp. 114 (D. Kan. 1996) (noting that the claim was based on alleged sexual harassment). In both Mousa and

15

Russell, the courts based their holding on section 2000e(f) as well as section 2000e-1(c)(2), which provides—identically to section 12112 of the ADA—that the unlawful practices provisions of the statute "shall not apply with respect to the foreign operations of an employer that is a foreign person not controlled by an American employer." Id.

A partial summary judgment in favor of Swish Kenco is appropriate because Trask has not presented any evidence that the American company—Swish Kenco—controls the Canadian company—Swish Maintenance Limited. On the contrary, his facts all essentially assert that Swish Maintenance Limited is the controlling entity. On that basis, as to the ADA claim, I recommend that the Court determine that there is no genuine issue of material fact concerning whether Swish Maintenance Limited employees should be aggregated with those of Swish Kenco for purposes of determining the statutory cap on damages. The undisputed fact is that there were fifty to sixty employees of Swish Kenco at the relevant time; those are the only employees to be counted in determining the size of the company. Consequently, the applicable damage cap is $50,000, pursuant to 42 U.S.C. § 1981a(b)(3)(A).

It should be noted that the parties did not brief this issue under the statutory language of the MHRA. Based upon my own research I am unable to locate any provision in the MHRA that is analogous to 42 U.S.C. § 12112(c)(2)(B) in terms of foreign persons. The Maine statute says that the term "employer" includes "any person in this State employing any number of employees, whatever the place of employment of the employees, and any person outside this State employing any number of employees whose usual place of employment is in this State." 5 M.R.S. § 4553 (4). To the best of my knowledge that language has never been interpreted by the Maine Law Court in the context of a case involving a foreign corporation that manages and controls a separate corporate entity in Maine, assuming that the Canadian parent in this case

16

exercises the kind of control that would give rise to an integrated enterprise, a factual premise disputed in the summary judgment record and the subject of contentious evidentiary objections by the defendant. In Mousa, 258 F. Supp. 2d at 1340, the court concluded that due to binding Eleventh Circuit precedent, it was compelled to conclude that the Florida Civil Rights Act's silence on the issue of extraterritorial effect regarding a foreign employer compelled it to include foreign citizens who worked abroad within the fifteen- employee jurisdictional count. I certainly do not view that reasoning as persuasive authority in the current circumstances. I recommend that the Court not reach this issue at this point, but rather allow the case to proceed without making a determination as to the compensatory damage cap under the Maine Human Rights Act. In the event a jury returns a verdict awarding compensatory damages in excess of $50,000.00, this Court can entertain post-judgment motions addressing the damage cap and the role of the integrated enterprise analysis based on a fully developed record.

### III. Conclusion

For the reasons set forth above, I recommend that the Court deny in part and grant in part Swish Kenco's motion for summary judgment. Specifically, I recommend that the Court deny Swish Kenco's motion on the issue of liability, but grant the motion as it concerns the cap on the compensatory damage award under federal law. I further recommend that this Court reserve any ruling on the territorial reach of the term "employer" under the Maine Human Rights Act until such time as a factfinder has made an award of compensatory damages that would necessitate resolution of that issue.

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the

district judge, if any is sought, within fourteen (14) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

      Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

January 4, 2013                         /s/ Margaret J. Kravchuk
                                                       U.S. Magistrate Judge